We're ready to start now on Davis v. State of Utah 20-4042. I'm sorry, I'm not sure about how to pronounce your name. Hule or Huley? It's Hule, your honor. If it may please the court, my name is Roger Hule. I represent two former employees of the University of Utah, Jasmine Davis and Barry Wilson. They allege in their pleadings that their employment was unlawfully terminated due to their whistleblowing activities. The district court erred in dismissing under Rule 12b their First Amendment claims. Their speech was protected because it was not ordinarily within the scope of their respective employment duties. What was their speech? It concerned, one, the waste of public funds, two, suspected violations of law, and three, concerns over the physical safety of university employees. The Robert case confirms that under the first prong of the Gar-City Pickering inquiry, the court takes on a case-by-case approach, looking at both the content of the speech and the employee's chosen audience in determining whether the speech was made to official duties. As to content, Knoth v. Williams teaches that the critical question is whether the speech at issue is itself within the scope of the employee's duties, not whether it merely concerned those duties. And as to chosen audience, this court in its case-by-case review generally distinguishes an employee's reports within the chain of command from an employee's reports beyond the chain of command. And, and I think this is important, a duty to speak to one audience does not necessarily give rise to a duty to speak to another audience. This court has made that clear in the Thomas case, where Mr. Thomas went beyond complaining to his supervisors and instead threatened to report to an agency outside his chain of command. And at that point, his speech, quote, ceased to be merely pursuant to his official duties and became the speech of a concerned citizen. And similarly, in the Casey case, speech on some topics and to some audiences was also protected, even though the protected speech concerned Casey's employment duties. Now, Davison-Wilson's reporting within UIT, the University Information Technology Department, was consistent with the university's general policy that, quote, all employees are engaged, are encouraged to report suspected improprieties to their supervisor or directly to a higher level if their supervisor is involved. That policy applies to every university employee, and it does not inform any specific employee's official duties. Davison-Wilson first raised concerns to their supervisors and their supervisor's supervisors based on that policy, based on that university-wide policy. But they then raised their concerns beyond their chain of command and beyond UIT to other university officials and in other university departments, and they were admonished for doing so. Examples include the Internal Audit Department of the university. Senior UIT managers directed Davison-Wilson, who was senior to, excuse me, directed Davison-Wilson, who was senior to Davison-Wilson, not to report her concerns and Davison-Wilson's concerns to the Internal Audit Department. Similarly, Davison-Wilson was criticized for reporting to the Huntsman Organization outside the university and was directed not to make any further contact there. Can you focus on, I thought we were focusing here on her duties, Davis's duties, but I'm not really hearing you do that in terms of how these, her speech to individuals inside the university but non-UIT officials, how did that speech, why didn't it relate to her job responsibilities? That's one of the problems with the district court's analysis. The court seemed to combine the fact that Davison-Wilson reported together with, and marrying that joint reporting with joint duties when in fact they had distinct duties. Well, that's why I'm trying, let's talk, let's start with Jasmine Davis. Let's talk about her speech inside the university but beyond UIT. What speech exactly do you point to in the complaint that is essentially outside of her performance of her official duties? Okay, they raised seven concerns. I'm talking about as pertains to Jasmine Davis. Yes, and the concerns two through six did relate to Jasmine Davis's duties. Okay. When she was reporting them. I'm sorry, you say did relate to, I thought you were distinguishing between something that concerned official duties and something that was pursuant to official duties. Yes, I think that's right, your honor. I appreciate that clarification. And so when, what is it clarified to say that those five were pursuant to official duties? Only to the extent that she complained within her chain of command. Once she went beyond her chain of command and beyond the university itself, as in Thomas and Casey, that changed. The audience changed and she had no duty to complain to all of the agencies and individuals. Let's talk specifics. I mean, let's talk specifics because that's your job in the complaint to tell us specifically about Davis's speech. Davis had no job responsibilities at all with respect to the first and the seventh. And what is the first? Let's talk about what the first was. The first was a $1,500 fabricated financial order, a purchase order. For what? It was for, well, it was a bogus order. It was just a bogus order, but Barry Wilson's name was- But what was it related to? It was for labor and services that they put Barry Wilson's name on and he had no knowledge of that until he discovered it later. In connection with what? Fiber optic cable and its installation. Okay. So this was- Desmond Davis didn't have any responsibility for that. And was this her speech or was this his speech? They complained jointly about all of their concerns. And so- What do you allege about Wilson's speech? What do you allege Wilson said? I don't want to hear, I'm sorry, Davis. I don't want to hear about Wilson right now. I want to hear what speech she made connected with that order. When they raised their concerns, your honor, they raised all seven of their concerns. To who? When? Well, as set forth in the complaint, they spoke with the state of Utah auditor. And so remember, we're focusing now on their within-university complaints. Within the university, they spoke to their immediate supervisor. And outside that? Outside that, they went to a number of university departments. For example, Wilson went to Fred Esplin, who was the director of the Red Butte Canyon. And where do you assert that she talked about this number one complaint, which to that individual about the financial order? I know it's detailed in the complaint, your honor. It's 101 page document, and I don't have that specific reference, but there are allegations in the complaint identifying specifically, not just communities, but specifically who they talked to, who they both talked to. John Nixon, which- It's important, not just who they talked to, but the content of that. How else can we decide whether that was part of Davis's as opposed to Wilson's job responsibilities? They were raising all seven concerns. That was their pattern. And that's what you alleged in the complaint, all seven concerns to all individuals at particular times? Yes, your honor. That is generally what is alleged in the complaint, and it's alleged in detail, but there were seven concerns that they raised. And it identifies who they raised them to beyond UIT, beyond their chain of command, both outside of UIT, but still within the university, and then outside the university itself. So I don't think we have a concern here, and I'm sorry, I don't have the specifics, but the complaint lays it out, and we don't do it vaguely. We don't do it without specificity. We talk about those seven concerns being relayed to numerous agencies and media organizations, taxpayer watch groups, other organizations beyond UIT, beyond the university itself. Did you make the argument below that you made all these allegations in the complaint in tandem, that they were jointly made? Yeah, well, that's how the complaint- Because the university suggests that you didn't make that argument below. I believe that we laid out in the complaint all of their separate responsibilities. We also laid out all of their joint concerns and how they complained about their joint concerns. And in order to properly analyze whether their speech was part of their official duties, the district court had to take that into consideration. Part of our criticism, Your Honor, of the district court is it seemed to lump them all together and said, well, they all complained about certain things, and therefore those were all part of their job responsibilities. The court misread paragraph 93, for example, which was a critical paragraph. And the court goes on and analyzes that, and we talk about that in our brief to some extent, because that was a critical mistake and it led to an inaccurate and incorrect ruling. But we did not raise that for the first time on appeal. We responded to what the court did in our briefs, but our complaint also details specifically what their separate responsibilities were. Okay. All right. Let me mention two quick things. Oh, my time is going very fast. With respect to clearly established law, the Casey decision and the Thomas decision are the cases we rely on for clearly established law. And Casey is very clear that this was a government action, and reporting those things publicly, as my clients did, that's protected speech. May I reserve the balance of my time? Thank you. Mr. Davidson? Good morning, Your Honors. May it please the court, I'm Joshua Davidson, Assistant Utah Solicitor General on behalf of the University of Utah, Stephen Hess, Stephen Corbato, Lisa Kuhn, Michael Ekstrom, Caprice Post, Jib Lynson, John Nixon, and Jeff Herring. The District Court's judgment should be affirmed in all respects. The District Court correctly dismissed on qualified immunity grounds Davis and Wilson's First Amendment claims, concluding that they failed to satisfy their burden on both prongs of the qualified immunity test. And the District Court correctly dismissed the UPPEA claims and properly denied Wilson leave to amend his complaint to include a similar UPPEA claim. The District Court, applying the Garcetti-Pickering test, correctly determined the complaint failed to plausibly ledge a First Amendment violation against the individual defendants. The complaint's allegations and exhibits show that their speech was either part of their job duties, the primary purpose of the speech was not to raise public concerns, or there was no causal connection between the speech and the adverse employment action. So if we look at the speech that is alleged, the complaint makes clear that the speech was pursuant to official duties. This court takes a broad view of pursuant to official duties and describes the Garcetti-Pickering test as a heavy barrier. So this speech is made pursuant to official duties if it stemmed from or involved the type of activities that the employee was paid to do or reasonably contributes to or facilitates the employee's performance of the official duty. Here, the complaint... Are you sure you're deriving that test? What authority are you citing for... That's in Rohrbaugh, I believe, that stems from or involves the types of activities that the employee was paid to do or reasonably contributes. This court has also described official duty speech in Casey as involving the person's portfolio, and it's described it as a, you know, a communications that would be attributable to the employer in green. So, you know, various pronouncements. This falls within the broad view of official duty speech. Well, I'm not sure how broad we should... Well... If you don't mind. It seems to me the court came pretty close to saying if it concerned their official duties, then it was pursuant to official duties. And that's my concern here, particularly when they go outside the chain of command. Did they have any obligation in their employment to go beyond the chain of command to complain about things? Yes, they allege that they had reporting responsibilities and duty to escalate. They both allege that in their complaint and in the attachment complaint, they had responsibilities to escalate issues if necessary. Explain what escalate means. If they found that an issue needed to be resolved, they could take it further up, higher up within the university. They could or had an obligation to? They allege that their job duties included the duty to report and to escalate. That is their allegation of the complaint. It is also the job description that they attach to the complaint from Mr. Wilson, the duty to escalate issues if necessary. Is there a limit on how high to escalate? Does it define the scope of the escalation? They don't define the scope of the escalation, but we know that they were both charged with the duties to collaborate across all departments and affiliates and to work with all departments and facility groups. But their duty to escalate and their duty to work with different groups, what they were reporting, you have to also realize what they were reporting. They had supervisory project management responsibilities. They were entrusted with cellular coverage for the entire wireless fiber and DAS solutions. They were tasked with review and renegotiation of contracts with maximizing lease revenue and with maximizing the monetization of UITA's infrastructure. I want to address the concern that they reported their speech together and that one and seven were not related to Davis while two through six were. With respect to the fabricated purchase order, the complaint makes clear that Davis got involved in this, that she helped clear this up. It doesn't matter that it was not a usual aspect, but he had a reporting line to her. They were an integral part of their team. And more importantly, this was for the purchase of a cable for the school of dentistry. And she was responsible for all contracts for services by hardware and software. And they were looking at this school of dentistry and trying to maximize the cell service. And the purchase was for infrastructure for the school of dentistry, for which they were working together to explore DAS solutions. And with respect to issue seven, the manhole cover. That was number one, the one you just addressed. Okay. Number seven was a manhole security communication, manhole and security. And so the complaint was access. There's access by vendors to the university's communication infrastructure. Okay. Ms. Davis was responsible for vendor relationships. And if they were not complying with their agreements, that was her responsibility. Also a member of the fiber team raised a safety concern specifically to Ms. Davis. And she was called directly to the site and she observed the site where the century link crew was performing the work. So the allegations of the complaint make clear that these, these two subjects, you know, were encompassed within her description. And that was all in the complaint as far as seven that she was called out to the site and all that. And yet, so that, yeah. Okay. So then I would like to like direct, like, you know, her reporting within the university, I think, you know, is really governed by the RORBA versus university of Colorado hospital authority decision. And they're the transplant coordinator in the transplant unit after raising concerns in her chain of command to her supervisor, the manager and the director of that unit, then reported the concerns outside the chain of command, but within the hospital system to the hospital's executive VP and to the president of the hospital. And then she went further and went to the hospital's risk management department. And the court there held that these communications with others in the hospital first fell squarely within the scope of the official duties. Similarly here, the communications with university employees and other departments, including the internal audit department, which is similar to risk management or within the scope of Davis's and Wilson's official duties. Let me add, that was in the scope of the duties and site RORBA. In RORBA she could be federally prosecuted for not taking care of these problems. Isn't that correct? The RORBA not only had a position with the university, but also am I mistaking my cases? I don't know, but I don't think that that's the Wayne factor here. I don't believe, you know, speaking within the university to people about cost-saving measures, which were the subject, why she was hired and what she was commissioned to do. And so raising it to the next level within the university fell within her job duties as they elect them in the complaint. And now with respect to communications outside of the university, I'm sorry, I got mixed up there. Go ahead. Okay. So I'd like to turn to the discussions outside of the university. Could you just address one question about within the university, if I'm understanding plaintiff correctly, he's suggesting that while they may have, their complaint does say that they had this responsibility to take matters outside the, you know, outside their own department and follow up the ladder, essentially, but that was sort of a university-wide responsibility. In the sense that it wasn't part of their individual job responsibilities. The policy applied universally to all employees, but they specifically alleged that they had escalation responsibilities and to escalate matters if necessary. And so was that within their individual job descriptions? Yes. Look at their individual job descriptions as alleged to the complaint. And I believe it's, I could, if you need the exact paragraph, but her job description and then his, the attachment, the complaint of his job, did he escalate issues if necessary? So those are within. So with respect to communications outside of the university, it's really important to address which, what was made when and to whom. Okay. Davis's June 24th, 2015 email. And that was a response to persons both inside and outside of the university. Mr. Wilson had written to an internal audit and had CC'd the Taxpayers Association and the State Auditor's Office. And Davis responded to that email. She responded to the internal audit and with the CC's stayed on it to the Tax Association. This is Exhibit 201, Appendix Volume 7, 1815. And Davis's response, if you just read the response, the subject of it is emailed is cellular carriers and services, lost lease revenue, cellular coverage issues, components of the master plan for the cellular coverage on campus, all of the issues. And the only issues raised in that communication, it falls squarely within her job duties, involved matters that were committed to her care. Now it's important to view this case in the terms of qualified immunity. And there was no case law on point, they point to none, which said that communicating with an internal person about matters that were committed to your care, if you CC people that aren't within that authority, that that somehow brings it out, makes the speech constitutionally protected. And so if any reasonable university official could have believed that that communication was about her job responsibilities, then they're entitled to qualified immunity. Because there was not clear, and this court has never held, simply by communicating with someone outside of the chain of authority, makes it constitutionally protected speech. And here the actual speech itself clearly involved her job duties. The second communication that she alleges was to the Huntsman Foundation, that's the July 15th, 2015 email, it's exhibit 178, appendix volume seven, number 1725. And if you look at the communications there, it is not a matter of public concern. They're talking about name calling, that so-and-so referred to somebody as a cancer, and that that was an ugly comment, and that she didn't, that she thought that Mr. Davis was on an apology. And so this is not a matter of public concern. There's one more thing that they alleged, and it was a communication with the Attorney General's office, and that's exhibit 118, appendix volume 1274. But that communication occurred after she had been separated and received her notice of separation. So there's no causal connection between those communications. And those are the only communications of which Davis participated on. So the other communications made by Mr. Wilson, and they're all alleged to have been made, you know, the ones made outside of the university, were all alleged to have been made after he was terminated in December of 2014. So his comments to the auditor's office, the Attorney General's office, the Governor's office, they were made after the fact. The decision that he was not eligible for rehire was made in January of, well, it was made contemporaneously with his termination, but it was communicated at the very latest on January 7th of 2015. And they've attached this to the complaint. And so it takes it out of the realm of plausibility that, you know, he was not eligible for rehire. So any of his reports are not causally connected. I see that my time is out. And so if you don't have any other questions, I would submit on the briefs. And it's a case argument. Thank you, counsel. Mr. Houle, you have some time, and I hope you'll address at one point the statement by Mr. Davidson that the complaint alleges a duty to escalate within the university. Whoops, you're muted, Mr. I hope we can. Thank you. That was going to be my first point. They did have a duty to escalate only based on that general policy that applied to all the university employees. Their complaint says nothing about a duty to escalate beyond that. They did escalate, but not pursuant to a duty. They took it all over the place and outside the university. But with respect to their responsibility to report, the policy only requires them to go to their supervisor's immediate supervisor. And that applies to everybody. The job descriptions are not attached to the complaint. There is no job description that talks about any kind of reporting responsibility. The only thing that there is in the complaint with respect to reporting is that general policy where you escalate just two steps within your chain of command. Now, with respect to the manhole... Who bears the burden of the fact that the job descriptions are not in the complaint? Well, your honor, we had 207 exhibits. Well, you have the burden of showing that these statements were not pursuant to job duties. And if we can't tell what the job duties are, you lose, don't you? No, we describe their job duties in the complaint. We just don't attach job descriptions. And those job duties as described in the complaint do not talk about the duty to report. They just don't. The only thing we have on a duty to report is that general policy from the university. With respect to the manhole issue, your honor, the employee called out by Mr. Wilson was Davis, Ms. Davis herself, not because it was her job responsibility, but because by that point, they were trying to help each other in reporting violations. It was not her job to go inspect manholes. But they were working together to report violations. One last issue, the causal I see my time has elapsed. You can finish that statement. With respect to the complaint to the Huntsman organization, the complaint there involved more than just the fact that Mr. Wilson had been described as a cancer that needed to be weeded out. It talked about other concerns they had, including the other, you know, the seven concerns that we addressed previously. Thank you. I'll submit it. Thank you both for your argument today. No more questions from the panel. So case is submitted. Counselor excused.